Filed 6/6/24  M.L. v. Superior Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| M.L., | D083764 |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | (Super. Ct. No. J520936) |
| Respondent; | |
| R.D. et al., | |
| Real Parties in Interest. | |

APPEAL from an order of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Children's Legal Services of San Diego, Nicole McConn and Ayana Faison, for Petitioner.

No appearance for Respondent.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

The Law Office of Gary S. Plavnick and Gary S. Plavnick, for Real Parties in Interest Erin D. and Ryan D.

Petitioner M.L., through her guardian ad litem (Petitioner or M.L.),[1] has filed a petition for an extraordinary writ under California Rules of Court,[2] rule 8.456 (Petition), seeking review of the juvenile court's posttermination order finding that it was in M.L.'s best interest to remain in the placement of real parties in interest and presumptive adoptive parents Erin D. and Ryan D. (sometimes PAPs), and not to be moved and placed with maternal grandparents Hilda C. (MGM) and Michael C. (MGF) (MGM and MGF are sometimes collectively referred to as Maternal Grandparents).[3]

In this writ proceeding,[4] Petitioner seeks reversal of the juvenile court's March 4, 2024 order (March 4 Order), arguing the juvenile court deprived her of the right to live with willing relatives, in violation of Welfare and Institutions Code[5] section 16001.9, subdivision (a)(5), and in

---

[1]   M.L.'s mother Yvette L. (Mother) and presumed father Ruben M. are not parties to this appeal.

[2]   All further rule references are to the California Rules of Court.

[3]   The August 2023 home assessment prepared by the Texas Department of Family and Protective Services states that MGM was born in February 1963; and MGF was then 51 years old.

[4]   The San Diego County Health and Human Services Agency (Agency) has filed a letter brief in partial support of the Petition. Although recognizing the "high burden Petitioner must meet on review," Agency has joined Petitioner in her "ultimate position that it remains in M.L.'s best interests to be removed" from the PAPs and placed with Maternal Grandparents.

[5]   Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

contravention of her best interest. Petitioner's prayer for relief asks us to "[c]onduct an evidentiary hearing to resolve any factual disputes," grant the Petition, vacate the March 4 Order, and enter a new order placing her with Maternal Grandparents. In the alternative, she asks us to grant the Petition and reverse the juvenile court's order of June 21, 2023 terminating parental rights, and remand for the court to hold a new hearing.

We conclude the juvenile court, in a detailed and thoughtful ruling, properly exercised its broad discretion when it found the best interest of M.L. was to remain placed with the PAPs, and that its findings in support of its exercise of discretion are supported by substantial evidence. We therefore affirm the March 4 Order. In so doing, we invite the parties to stipulate to an immediate remittitur to expedite M.L.'s adoption proceedings with the PAPs. (Rule 8.272(c)(1) ["A Court of Appeal may direct immediate issuance of a remittitur only on the parties' stipulation or on dismissal of the appeal under rule 8.244(c)(2)."].)

FACTUAL AND PROCEDURAL BACKGROUND[6]

A. *Dependency Proceedings*

M.L. was born in late December 2021 with a positive toxicology screen for amphetamines. A few days after her birth, Agency received a referral alleging general neglect of the child. In early January 2022, the juvenile court detained M.L. and ordered her placed in a licensed foster home, after finding "there [was] not [a] relative available who [was] able and willing to care for the child." M.L. was placed in the resource family home of Pilar G.

---

[6] We summarize the facts in the record by presenting them in a light most favorable to the juvenile court's March 4 Order. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)

3

At the contested jurisdiction/disposition hearing the following month, the juvenile court sustained the petition under section 300, subdivision (b), and declared M.L. a dependent. The court ordered an Interstate Compact on the Placement of Children (ICPC)[7] to assess MGM, who lived in El Paso, Texas.

In August 2022, an Agency social worker discussed the ICPC process with MGM. During this conversation, the social worker reminded MGM that she had been asked "multiple times" about placement of M.L. but always "showed hesitancy." After discussing the ICPC process, MGM did not request an immediate evaluation for placement, and clarified that, "if the case goes to adoption[ ], she would like to be assessed to adopt; however, if the court continued services to the [M]other, she would like the baby to stay with [Pilar] to allow [Mother] visitation."

At the contested six-month review hearing in September 2022, the juvenile court terminated Mother's reunification services and scheduled a section 366.26 hearing to implement a permanent plan for M.L.

In early December 2022, when M.L. was about a year old, Pilar informed Agency that Mother had not visited since the child had been in her care; that MGM had had only one in-person visit and had called only three times to inquire about the child's well-being; and that while Pilar loved M.L., she was too old to agree to a permanent plan and believed the child needed younger parents.

---

7    An ICPC is a statutory agreement between states governing placement of children from different states. (*In re C.B.* (2010) 188 Cal.App.4th 1024, 1032 [" ' "The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children." ' "].)

4

A few days later, an Agency social worker spoke with MGM, asking if she wanted to be assessed for placement of M.L. MGM responded that she was interested in placement, but only as a legal guardian because she did not want to "terminate parental rights."

In late December 2022, MGM asked Agency whether she and Pilar could "share custody" of M.L. MGM told Agency that MGF had been "surprised" and "shocked" about the potential placement of M.L. in their care, as he believed the child was too young. MGM also indicated that MGF worked in an oil field for 21 days at a time, with 10 days off. As a result, MGM informed Agency that "they cannot have M.L. in their care and that she does not want to be evaluated for placement," as she did not want to make her husband "uncomfortable." Agency thus informed the ICPC liaison that MGM had withdrawn her placement request.

MGM also inquired whether the dependency could be delayed at least six months, as M.L.'s half-sister D.L. (who went by the name of Jada) intended to move to El Paso and, after turning 18, to care for M.L.[8] MGM stated she had land and could build a home for Jada to live in.

Also in December 2022, Pilar informed Agency that she did not want to move forward with the adoption of M.L. In response, Agency began the process of matching M.L. with an adoptive family. In its January 24, 2023 section 366.26 report, it recommended termination of parental rights and a permanent plan of adoption for M.L.

B. *Agency Places M.L. with the PAPs, Who Were Committed to Adoption*

In about February 2023, M.L. began participating in a transition plan with the PAPs, who expressed a desire to move forward with adoption. Just

---

[8]     M.L. had three maternal half-siblings: Ca.L., a 21-year-old brother (as of January 2024), Jada, and a 14-year-old sister C.L.

prior to the child's placement on April 17, 2023, Pilar told Agency she was " 'happy that M.L. [was] going to be placed with the [PAPs],' " as they were " 'young, full of energy, very loving and attentive' " to the child.

In mid-April 2023, Agency informed MGM that at no point had it agreed to delay the dependency until Jada turned 18, as MGM had claimed. MGM informed Agency that M.L.'s adult half-brother Ca.L. and Jada wanted to adopt M.L.; that they were planning to come to San Diego to look for a place to live and work; and that MGM would "assist" in M.L.'s care when they needed "help." The following day, the social worker spoke to Ca.L., who stated he was not interested in being assessed for placement of M.L.

Later in April, MGM informed Agency that Ca.L. and Jada were in San Diego and that Ca.L. had changed his mind about placement. The social worker declined to consider that option because Ca.L. did not have a home to be assessed. MGM then stated she wanted to be assessed for placement, telling the social worker, " 'I can take care of [M.L.] for a while. We could wait until my granddaughter [Jada] is 18, so she can take care of M.L. We could work as a team.' " MGM went on to state that " '[t]he only thing she wants is that [M.L.] is not adopted.' " The following day, the social worker resubmitted the ICPC for MGM.

In its May 23, 2023 addendum report, Agency noted concerns about placement of M.L. with MGM due to her lack of "commitment," as she had not moved forward with the previous ICPC and her relationship with M.L. appeared to be "inexistent." Agency was also concerned about this placement because MGM wanted Jada to be the child's primary caretaker. Agency therefore determined it was in M.L.'s "best interests" to remain in the placement with the PAPs "in the event that [MGM's ICPC was] approved"; as M.L. had formed a "secure attachment to her caregivers, her caregivers love

6

her and have demonstrated that they could meet M.L.'s emotional, physical, and social needs"; and they wanted to adopt her.

At the contested section 366.26 hearing on June 21, 2023, the juvenile court terminated Mother's parental rights.

C. *Agency Recommends Relative Placement*

In late November 2023, Agency informed the PAPs the Texas ICPC for MGM had been approved in August 2023, and Agency therefore recommended a change in placement to Maternal Grandparents. In early December 2023, the PAPs filed a request for prospective adoptive parent designation. A few days later, Agency served the PAPs with a notice of intent to remove. Agency explained it was recommending removal because it had received an approved ICPC for MGM and had "completed the [section] 361.3 assessment and [determined] it [was] in the best interest of the minor to be placed with her relatives."

In mid-December 2023, the juvenile court found Erin and Ryan qualified as prospective adoptive parents.

The PAPs timely objected to removal. They noted that since M.L. had been in their care, MGM had had no in-person visits with the child and about six video visits that had been "effectuated" by the PAPs. The PAPs thus claimed that placing M.L. with MGM would be tantamount to placing her with a "virtual stranger."

In its December 18, 2023 status review report prepared in connection with the posttermination review hearing, Agency again recommended placement of M.L. with Maternal Grandparents. The December 18 report noted that Agency social worker Michelle Rettinghaus had been assigned to this case in late July 2023; that during this reporting period, she noted M.L. was "thriving" in the care of the PAPs; and that the PAPs had met "all

7

necessary adoption requirements." The report also noted that Erin had relocated to Ohio in August 2023 for the start of the school year, and had been flying back and forth to San Diego; that Ryan had become M.L.'s primary caretaker, and they had planned on moving to Ohio in mid-February 2024 to join Erin; and that the PAPs had started the required classes for an Ohio foster care license.

Agency engaged in a section 361.3 analysis and considered several statutory factors including the best interest of the child. On the best interest factor, Agency concluded M.L. would be better off in the care of Maternal Grandparents, as she would be "afforded the opportunity to have immediate access to valuable information regarding family history, medical history, familial culture/traditions and life of the birth parents"; and there was "a stark difference between having relatives provide that information with love and in detail, rather than limited information from the case files or an Adoptive Telling. . . . While the Agency acknowledges that her current caregivers have provided great care and love to [M.L.], the long-term benefits [M.L.] will experience throughout her life by being raised in her family of origin outweigh any immediate emotion[al] impact to the disruption from her current caregivers." Agency concluded that, because M.L. was "a very young child who will be able to easily transition from her caregivers to relatives," she "would not experience serious detriment should she be placed with a relative."

Also in its December 18 report, Agency addressed who would be taking care of M.L. if placed with Maternal Grandparents. MGM stated Jada planned on moving from Houston to El Paso and caring for M.L. during the day, while MGM was at work; and that if Jada did not move, MGM would take an early retirement and care full time for the child. Jada, when asked

8

about this arrangement and whether this was something she "truly wanted to do or if she was doing it because it is what she thought she had to do," responded, " 'it's a mixture of both.' "

Another section 361.3 factor considered by Agency was relative placement. It noted MGM "was given *preferential consideration* as multiple ICPC's have been submitted to have her home evaluated and considered for placement. Her home was approved for placement in Texas." (Italics added.)

Regarding the nature and duration of the relationship between Maternal Grandparents and M.L., Agency noted that MGM had had less than five contacts with the child during her initial 13-month placement with Pilar; that after M.L. was placed with the PAPs, MGM, while inquiring about the status of her ICPC in August 2023, asked that the PAPs be given her contact information (but not vice-versa); that Agency provided MGM's contact information to the PAPs on August 23, and the following day Erin "reached out" to MGM; that between August and November 2023, "there were a few video visits, 2 of which were initiated by the [PAPs] and a 3rd was initiated by [MGM], only after the [PAPs] sent a picture of [M.L.]"; and that since MGM has had the PAPs' contact information, MGM had "only initiated contact one time, after PSW Rettinghaus reminded her that the [PAPs] were open to her reaching out. On 11/20/2023, PSW Rettinghaus stressed the importance of phone calls and virtual visits, as [MGM] indicated she wanted contact and placement, but was not reaching out to initiate contact. [MGF] reported that he had not yet met [M.L.], as the video calls have happened while he was out on in the field, but his wife has sent him the pictures from the [PAPs]."

Although Agency believed that both the PAPs and maternal relatives could meet the needs of M.L., it recommended relative placement so the child

9

could be raised by "her biological family." Agency's recommendation did not change in its January, February, and March 2024 addenda.

D. *The Contested Section 366.26, Subdivision (n) Hearing*

The five-day section 366.26, subdivision (n) (section 366.26(n)) hearing commenced in mid-January and was completed in early March 2024.

1. Social Worker Rettinghaus

Rettinghaus testified that the PAPs provided M.L. with a safe, stable, and loving home; that the child called Ryan " 'Dada' "; that the PAPs had met all the requirements to finalize adoption and had been "committed" to it "throughout this process"; that the adoptive telling was completed in September 2023 and was to be read by October 2023; and that the PAPs were prepared to proceed with signing the adoption paperwork but that Agency chose to wait.

Rettinghaus confirmed Agency's reports from December 2022, including that Pilar felt she was too old to adopt M.L.; that as a result, Agency spoke to MGM about placement, who stated she did not want the permanent plan of adoption but instead a legal guardianship; that MGM also asked if she and Pilar could "share custody" of the child; and that MGM told Agency her husband was "uncomfortable" having M.L. placed in their home, and therefore she did not want to be assessed for placement.

Agency thereafter began to look for another adoptive home. The PAPs began transitional visits with M.L. in February 2023, with the goal of moving the child into their home and adopting her. As late as May 2023—while the ICPC of the Maternal Grandparents was pending, Agency still considered placement with the PAPs to be in M.L.'s best interest.

Rettinghaus also confirmed there was "no need to remove the child from [the PAPs'] care"; that MGM *and* MGF were committed to adopting

M.L.; but admitted that MGF had never visited the child. Rettinghaus believed that since April 2023, MGM had been "fully committed to adopting" M.L., after Agency had recommended termination of parental rights and the permanent plan of adoption.

However, Rettinghaus admitted that, in April 2023, MGM had inquired whether M.L.'s half-siblings could be assessed for placement rather than MGM; whether the dependency could be delayed until Jada turned 18 so they could care for the child as a "team"; and MGM had stated the " 'only thing' " she did not want was the child being adopted by strangers. Rettinghaus nonetheless believed it was important to continue investigating placement with Maternal Grandparents, as she was satisfied that Agency's previous concerns about MGM's commitment to adopt M.L. had been "mitigated."

Rettinghaus testified MGM had two children from another marriage, Mother, and a son named Adrian, who was currently incarcerated in Arizona. Rettinghaus was unconcerned about the struggles of MGM's two adult children in recommending placement, testifying that Mother and Mother's brother were "their own people."

2. Jada

Jada had just turned 18 years old and was living in Houston. She testified it would be "wonderful" for Mother to have contact with M.L. if Maternal Grandparents adopted M.L., as long as Mother was in the "process of recovery." Jada described Maternal Grandparents' home as "very stable," her grandparents as loving and caring, and her relationship with her two siblings as close.

Jada was agreeable to moving to El Paso and living in Maternal Grandparents' home if M.L. was placed with them. She was "[v]ery confident" that she had enough experience to care for M.L., as she had

11

babysat her cousin's son every week "from morning to night" while she (Jada) was attending middle school. Jada planned to enroll in online college courses and act as M.L.'s "primary caretaker" from "morning to night" for the next three to five years.

Jada was questioned about MGM's statement to Agency in mid-April 2023 that Jada and her older brother Ca.L wanted placement of M.L. Jada testified that what MGM had meant was that Jada and her brother would take placement of M.L. "if anything were to happen to [MGM]," because they "did not want [M.L.] to be in a home of strangers."

Jada and sister C.L. met M.L. shortly after M.L.'s birth in late December 2021. March 20, 2023, was the next contact Jada had with M.L., when Mother, during an in-person visit with the child, called Jada. Jada also had about four or five in-person visits with M.L. in late May 2023, when Jada came to San Diego to see Mother.

In late fall, early winter 2023, Jada reached out to the PAPs, who in return sent pictures and videos of M.L. Jada also had in-person visits with M.L. in mid-January 2024, shortly before testifying at trial. She reported those visits went extremely well. Jada believed M.L. would benefit from her "sisterly love," and was excited to teach M.L. about their "Hispanic culture."

3. MGM

MGM worked as a "case aid" at a shelter for unaccompanied minors. MGF worked as an oil field technician for 21 days on and now 21 days off. Because of his schedule, MGF had been unable to visit with M.L. until just a few days before MGM's February 2024 testimony. MGM never observed any hesitancy by MGF for placement of M.L. In addition to her and MGF, the only other person then living in the family home was their 19-year-old son Colby H.

12

MGM had two other children from another marriage, Mother and Adrian. Mother ran away from home before turning 18. Adrian lived with MGM until he was about nine or 10, when he moved into the home of paternal grandmother following MGM's divorce from his dad. MGM confirmed Adrian was incarcerated; he was set to be released in about a year.

As for Mother, MGM would allow visits with M.L. as long as Mother was in a 12-step program and had a sponsor. MGM had no concerns that Jada could make "safe decisions" if Mother wanted contact with M.L.

MGM reported having a large extended family who lived nearby and supported M.L.'s placement. She had strong ties to her church and Hispanic culture; was bilingual, as was MGF and their son Colby; and hoped to pass that culture to M.L.

MGM first met M.L. in mid-January 2022, during a two-hour visit that included granddaughters Jada and C.L. MGM then had no concerns about her granddaughters living with Mother, as MGM did not believe Mother was a "user" but only a "depressed mother who [had] just lost her baby." A month later, Jada and C.L. went to live with Maternal Grandparents in Texas.

MGM believed Agency had acted "unfairly" when it placed M.L. with the PAPs because MGM had not been informed of the move and it had always been her "understanding" that once Pilar could no longer take care of M.L., the child "would come to family." After the move, MGM and the PAPs had "good" communication, including setting times for video visits. MGM estimated she had about nine video visits with M.L. in 2023; with each visit lasting up to 40 minutes.

Starting in mid-January through mid-February 2024, MGM estimated she visited M.L. twice a week when in San Diego attending the trial. These visits included two overnights. MGM and MGF were committed to adopting

M.L. if the child were placed in their care, and would adhere to any court-ordered transition plan. She also supported Pilar and the PAPs having future contact with M.L.

During cross-examination, MGM was asked about statements Agency attributed to her in its earlier reports, including in December 2022. MGM denied making several of them. However, she recalled asking Agency whether it was possible to keep the dependency open for an additional six months until Jada turned 18. MGM, however, could not recall being told by Agency on April 10, 2023, that it had never agreed to such an arrangement. Nor could she recall making the statement on April 25, 2023, that she could take care of M.L. "for a while" until Jada turned 18.

MGM testified that during the April 10 conversation when she asked Agency whether it would consider placing M.L. with siblings Ca.L. and Jada, what MGM had actually said was that sibling placement would be "Plan B" if something happened to MGM.

MGM admitted that MGF came to San Diego and met M.L. in February 2024 because of Rettinghaus's testimony that he had never visited with the child. She also admitted the PAPs loved and nurtured M.L. and provided M.L. with a good home; and that she had never spoken to any of M.L.'s medical providers.

4. Erin D.

Erin was a special education teacher currently working in Toledo, Ohio; and husband Ryan worked as a Navy corpsman, just days away from retiring from the military. They obtained their foster care license in May 2017.

Agency first contacted them about M.L. in January 2023. Agency informed the PAPs that M.L.'s first caregiver was no longer able to care for

14

the child; that Agency was recommending termination of parental rights "in the very near future"; and that M.L. was in need of a long-term placement.

The PAPs first met M.L. at the end of February 2023, had weekly all-day visits with the child, and after about a month, began overnights. M.L. was placed with them on April 17, 2023; the PAPs were committed to adopting M.L. from day one. Agency then informed them there were no relatives who wished to adopt the child. Erin participated in a child and family team meeting on April 17, as did Jada. During the meeting, Jada expressed an interest in her and her brother taking placement of M.L., but Agency dismissed that option because Jada was still a minor.

Once in the PAPs' care, Mother had three or four one-hour virtual visits with M.L., two of which Jada attended. In August 2023, the PAPs learned of MGM's ICPC request. Social worker Rettinghaus told them that Agency needed to assess MGM, but it was not interested in changing placement.

M.L.'s first virtual visit with MGM took place around the end of August 2023, after Erin initiated contact with MGM. MGM's virtual visits were "sporadic," averaging about one a month, with no visits some months. In January 2024, their visits increased at Agency's request. Typically only MGM visited, although Jada participated a "few times"; one time M.L's older brother Ca.L. "popped in" to the visit and said "hello."

The PAPs were aware of M.L.'s Hispanic heritage and wanted to promote it. The school district where Erin worked had a bilingual charter school. She already had spoken to the school principal about having M.L. attend once the child was of school age. In addition, several of the PAPs' family members were fluent in Spanish, including Erin's father.

Regarding their living situation, at the start of the 2023 school year Erin accepted a job in Ohio, where the family intended to relocate after Ryan

15

retired from the military and their adoption of M.L. was finalized. The PAPs were both from Ohio and wanted to move closer to family and friends. Agency knew of their desire to relocate when M.L. was placed in their care. Although Agency made no promises, it initially believed the adoption would be final around December 2023. Because Ryan had three months off from work, he and M.L. traveled to Ohio for extended visits to keep the family intact.

If M.L. remained in their care, the PAPs agreed to maintain a relationship between M.L. and her biological family.

5. Agency's Expert

The parties stipulated that David Brodzinsky was an expert in five areas: child development; the psychology of attachment in foster and adopted children; adjustment issues in adoption; sibling relationships in foster care and adoption; and best practices in foster care adoption and kinship adoption. Dr. Brodzinsky never met with M.L., her relatives, or the PAPs in preparation for his testimony, stating his role in this case was "educative" and not "evaluative." He therefore was not retained to make any placement recommendation.

Dr. Brodzinsky discussed "attachment theory," noting it was useful in court cases and was an "important aspect of human development." He opined that attachment was only one of several factors to be considered when placing a child; and that others to be considered included the "qualities" of the child; the quality of care a child was likely to receive in a new placement; whether the placement was with relatives or nonrelatives; and whether the child was going to a home where siblings would be present.

Dr. Brodzinsky further opined that it was "pretty common" for children in foster care to successfully transition from a nonrelative to a relative home.

16

Children who are attached to a caregiver and subsequently moved into a new placement may experience short term effects, but in the long term that attachment would be a predictive factor for better adjustment in the new home. He added that relative placement often reduced "adoption-related loss" because the child typically has access to many in the family with whom he or she shares "similar traits." However, he noted the long-term effects of placement change on a child of about two years old who has formed a secure attachment with caregivers were "difficult" to predict; he added, "there is considerable variability in the long-term adjustment of children who experience one or more placement changes, even when there's secure attachment in one or both of those" placements.

Dr. Brodzinsky opined there are "great benefits" for an adopted child to grow up with siblings because such relationships are typically the "longest lived relationships" an adopted child will have. He noted that the differences in the ages between an adopted child and his or her siblings may affect the benefits of a sibling relationship, as they likely will not be playmates or have shared interests; but that an older sibling may become an attachment figure for the younger adopted child.

On cross-examination, Dr. Brodzinsky noted that his testimony reflected what most children will experience when raised with siblings or in a relatives' home, but that such "group data" did not apply to "individual children."

6. The PAPs' Expert

The parties stipulated that Yanon Volcani was an expert in the best interests of the minor; secure and other types of attachments; the seven core issues of adoption; trauma; bonding and attachment, including all of the various types of attachment; risks associated with disrupting developing

17

secure attachments for young children; and psychological and therapeutic issues relating to adoption.

The PAPs retained Dr. Volcani to assess the nature and strength of M.L.'s attachment to them; and whether it would be in the child's best interest to be removed and placed with Maternal Grandparents. He also considered whether M.L. might experience trauma if removed from the PAPs. In preparation for his testimony, Dr. Volcani reviewed Agency's section 366.26 report as well as addenda, and Agency service logs; met with the PAPs four times via a HIPPA-compliant video chat platform; and had two in-person meetings with the PAPs and M.L. in his office. During the in-person meetings, he observed the interaction between the PAPs and M.L., met with each parent separately, and then had both parents leave the room so he could meet with M.L. alone.

During their first in-person meeting, M.L. walked into Dr. Volcani's office, looked at the toys and went "right for them." He described her as being a "delightful" child, finding her "explorative" and "engaging."

Based on Agency reports and his own observations, experience, and training, Dr. Volcani opined it was not in M.L.'s best interest to remove her from the PAPs. He noted the child was doing "very well" in their care and exhibited all the signs of having a "deep, primal, primary attachment" to them. He felt the risk of trauma was "very significant," and could have "potentially profound consequences in the long run," if Agency changed her placement.

In support of his opinions, Dr. Volcani noted M.L. called the PAPs "MaMa" and "DaDa" and saw them as her "psychological parents." During the office visits, M.L. displayed the "classical behaviors of a securely attached toddler," as she engaged with the PAPs, sought their attention, then

18

"refuel[ed]" and continued to play; when, at his direction, both caregivers left his office, M.L. did not "freak out," and when they returned, she was "delighted."

Dr. Volcani observed the PAPs had a "secure parenting style," as they were "attuned to the subtle nuances" of M.L.'s moods and focused on her "affects, her states, her well[-]being." In return, M.L. showed she was attached to the PAPs, as she turned to them when she needed something, and sought contact with them "eagerly and purposefully."

He added that a "secure attachment" was a "means toward the development of self," not some end point; that a secure attachment was particularly important in the early stages of life; and that if a secure attachment is disrupted during this crucial stage, the "deficits" can be "potentially profound," as it affects the formation of brain structures that predict functioning throughout life.

Speaking specifically about M.L., Dr. Volcani opined that she could suffer a "reactive attachment disorder" if removed from the PAPs. This disorder results when a child experiences trauma, when, for example, he or she is separated from a primary caregiver. He noted that a child between the ages of two and three would be most likely to suffer trauma under such circumstances, leading to an "overwhelming sense of abandonment."

Dr. Volcani further opined that if M.L. was able to do relatively well in the company of others while away from the PAPs, it did not necessarily mean she was becoming securely attached to someone else. Instead, it was more likely a result of having a secure attachment to the PAPs.

19

7. Findings and Order

The juvenile court considered the mountain of evidence in this case, including the parties' briefs, the Agency's reports and other documentary evidence, as well as the witness testimony; and, in a thoughtful and detailed ruling, found Agency had not met its burden under the preponderance of the evidence standard to show that removal of M.L. from the PAPs was in her best interest.

The juvenile court summarized the reasons given by Agency in seeking M.L.'s removal from the PAPs: "The Maternal grandmother has requested placement and has an approved ICPC. The Agency has completed a . . . section 361.3 relative placement preference assessment, and it is in the best interest of [M.L.] to be placed with relatives." The court added, "Agency doesn't articulate any deficiency or neglect in the prospective adoptive parent[s]' care of [M.L.] The Agency has invited the court to include in its . . . analysis an assessment of the factors provided as part of the relative placement preference." However, as discussed *post*, the court correctly ruled that the relative placement preference was inapplicable in this case, although it did consider some of the factors in section 361.3—including the best interest of the child—in making its determination.

As also discussed *post*, the juvenile court found the testimony of MGM and Jada "less than credible"; the expert testimony of Dr. Brodzinsky "less helpful" than the testimony of Dr. Volcani, which it found persuasive in part because he met and interacted with the PAPs and M.L.; and found Erin's testimony credible.

Although the juvenile court had no concerns about M.L.'s care in the PAPs' home, noting the child was securely bonded to them and them to her, it had several concerns about what her care might be like if placed with

20

Maternal Grandparents, including:  MGM's hesitancy in seeking placement, her lack of contact with M.L. throughout much of dependency, and MGM's own struggles with her two adult children; Jada's age and inexperience in caring for children, and her lack of contact and a relationship with M.L. throughout much of dependency; and MGF's lack of any relationship with M.L. and his concerns throughout dependency about taking placement.  The court also considered the sibling relationship, the benefits of growing up with biological relatives, and other factors in making its decision.  It denied the Petition, ordered M.L. to remain placed with the PAPs, and set a postpermanency planning hearing.

## DISCUSSION

Petitioner (through her guardian ad litem) makes a series of arguments in support of her contention that the juvenile court erred in finding removal from the PAPs and placement with Maternal Grandparents was not in her best interest under section 366.26(n).  Before reaching the merits of the Petition, we must briefly address some preliminary issues.

A.  *Threshold Issues*

First, in her prayer for relief, Petitioner requests that we take judicial notice of the transcripts, briefs, and court records in San Diego County Superior Court case No. J520936.  (See Evid. Code, § 452, subd. (d) [judicial notice may be taken of "[r]ecords of (1) any court of this state"].)  These documents are already part of the record in this case, and thus we deem Petitioner's request to be moot.

Second, to support her claim of error in this case, Petitioner asks us to "conduct an evidentiary hearing" and "resolve any factual disputes" between the parties.  Petitioner misperceives our role as a court of review.

21

"It is an established principle that the credibility of witnesses and the weight to be given their testimony are matters within the sole province of the trier of fact, here the trial court. [Citation.] An appellate court will not reweigh the evidence, but rather views the record in the light most favorable to the prevailing party and resolves all evidentiary conflicts and indulges all reasonable inferences in support of the judgment." (*As you Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454 (*Conbraco*), citing *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 (*Mix*); accord, *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 (*Casey D.*) [an appellate court lacks the authority "to judge the effect or value of the evidence, to [re]weigh the evidence, . . . or to resolve conflicts in the evidence"].) We thus decline Petitioner's invitation to conduct an evidentiary hearing or reweigh the evidence.

Third, on the assumption we do not order M.L. placed with Maternal Grandparents, Petitioner alternatively requests that we reverse the juvenile court's order of June 21, 2023 terminating parental rights, and remand the cause for a "new" section 366.26 hearing. However, no appeal was taken from the June 21 order, and the time for appeal has long since passed. (See rule 8.406(a) [notice of appeal must be filed "within 60 days after the rendition of the judgment or the making of the order being appealed"]; see also *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1832, fn. 8 (*Daniel D.*) [" 'An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing an appeal has passed.' "].) We therefore reject Petitioner's alternative request to reverse the June 21 order terminating parental rights and remand the matter for a new section 366.26 hearing.

With this background, we turn to the fundamental question in this case: whether the juvenile court erred when it ruled that it was in M.L.'s

best interest to remain in the care of the PAPs rather than be removed and placed with Maternal Grandparents in Texas.

B. *Posttermination Removal*

1. Guiding Principles

a. *Section 366.26(n)'s place in the statutory dependency scheme*

Our Legislature has designed three statutory preferences during dependency. (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 489 (*Amber G.*).) At the beginning of dependency, the statutes focus on family reunification. (*Ibid.*) After the juvenile court terminates reunification services, the statutes shift focus to the child's permanency and stability. (*Ibid.*, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 319 (*Stephanie M.*) [at this stage of dependency the parents' interests "are no longer paramount"].) And after termination of parental rights, the "statutes become laser focused on quickly facilitating adoption." (*Amber G.*, at pp. 489–490, citing *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 46 (*T.W.*) ["The core function of both the agency and juvenile court after parental rights have been terminated is to ensure the child's *prompt* adoption in a safe, stable, loving home.'"].)

"At the outset of a dependency case, section 361.3, subdivision (a), requires the social services agency [SSA] and the court to give 'preferential consideration' to a relative's request for placement, which means 'the relative seeking placement shall be the first placement to be considered and investigated.'" (*Amber G.*, *supra*, 86 Cal.App.5th at p. 490, quoting § 361.3, subd. (a).) When assessing any relatives for placement, the juvenile court and the social services agency "shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or

23

emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) [Other Family Code provisions] regarding relative placement. [¶] (4) Placement of siblings and half siblings in the same home . . . . [¶] (5) The good moral character of the relative and any other adult living in the home. . . . [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative" to provide the child with benefits outlined in subdivisions (A) through (I). (§ 361.3, subd. (a)(1)–(7).)

While section 361.3 facilitates the strong public policy favoring family reunification (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 797), "**the statute does *not apply* after termination of parental rights**. 'There is no relative placement preference for adoption.' " (*Amber G.*, *supra*, 86 Cal.App.5th at p. 492 (bold text added), quoting *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 (*Lauren R.*).) Section 361.3 is replaced by the caretaker preference (§ 366.26, subd. (k)) and, as relevant in this case, by the prospective adoptive parent preference that arises posttermination (§ 366.26(n)). " 'A placement request by a relative after a permanency hearing is essentially a request to modify the child's permanency plan and must be heard under the [appropriate] statutory framework.' " (*Amber G.*, at p. 492.)

b. *Section 366.26(n) and the burden of proof*

Section 366.26(n)—the prospective adoptive parent preference—"*limits* SSA's authority to remove a child from his or her prospective adoptive parent's home after parental rights are terminated." (*Amber G.*, *supra*, 86 Cal.App.5th at p. 494, citing § 366.26(n); see § 366.28 [setting out the procedures for appealing decisions involving placement or removal orders

24

following termination of parental rights, evincing the Legislature's recognition that the juvenile court shall, in such circumstances, intervene in placement decisions "only in exceptional circumstances"].)

" '[T]he Legislature enacted section 366.26[, subdivision] (n) "to strengthen the juvenile court's oversight and to protect the stability of children after parental rights are terminated . . . ." [Citation.] The statute addresses a legislative concern that an unjustified agency action in removing a child from a long-term caregiver might not be in the child's best interest.' [Citation.]" (*Amber G., supra,* 86 Cal.App.5th at p. 494.) "Prior to its enactment, there was no statutory provision that would allow the juvenile court to 'override [SSA's] selection of an appropriate foster home for a dependent child.' [Citation.]" (*Ibid.*; *T.W., supra,* 203 Cal.App.4th at p. 44 [section 366.26(n) "was designed to correct the ' "nearly complete, unchecked authority" ' appellate courts had given to a child welfare agency to decide a dependent child's adoptive placement after termination of parental rights."].) The statute "represents a paradigm shift in the standards to be applied to agency decisions in the narrow category of posttermination removal of children from designated adoptive placements." (*State Dept. of Social Services v. Superior Court* (2008) 162 Cal.App.4th 273, 286.)

If a prospective adoptive parent objects to a SSA's recommendation to remove a child posttermination, as was the case here, the juvenile court shall determine "whether the proposed removal of the child from the home of the designated prospective adoptive parent is in the child's best interest, and the child may not be removed from the home of the designated prospective adoptive parent unless the court finds that removal is in the child's best interest." (§ 366.26(n)(3)(B).) The SSA bears the burden of proving by a preponderance of the evidence that the child's best interest requires removal.

25

(*Amber G.*, *supra*, 86 Cal.App.5th at p. 494; *T.W.*, *supra*, 203 Cal.App.4th at p. 45; rule 5.727(g) ["At a hearing on an intent to remove the child, the agency intending to remove the child must prove by a preponderance of the evidence that the proposed removal is in the best interest of the child."].)

The best-interest-of-the-child standard is the " 'fundamental goal of the juvenile dependency system, underlying . . . child safety, family preservation, and timely permanency and stability.' [Citation.] ' " 'It's purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " ' [Citation.] Stability and continuity of care are primary considerations in determining the child's best interest.' " (*In re J.M.* (2020) 44 Cal.App.5th 707, 718 (*J.M.*).)

   c. *Standards of review*

A juvenile court's decision whether to authorize a change in a minor's placement is reviewed for abuse of discretion. (*Amber G.*, *supra*, 86 Cal.App.5th at p. 495.) "[W]e will not disturb a juvenile court's custody determination unless it exceeds the limits of legal discretion. ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " ' " (*Id.* at p. 496, quoting *Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319; accord, *J.M.*, *supra*, 44 Cal.App.5th at p. 718 ["Custody determinations in dependency proceedings are 'committed to the sound discretion of the juvenile court,' and such rulings 'should not be disturbed on appeal unless an abuse of discretion is *clearly* established.' " (Italics added.)].)

However, " 'we must also review the juvenile court's finding that the change [in placement] is [or is not] in the minor's best interests to determine whether there is substantial evidence in the record to support it.' [Citation.]" (*Amber G.*, *supra*, 86 Cal.App.5th at pp. 495–496.) " 'Under the substantial

26

evidence standard of review, an appellate court reviews the record in the light most favorable to the trial court's' findings. [Citation.] " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " ' " (*Id.* at p. 496.)[9]

Moreover, the juvenile court here made several credibility findings. It is axiomatic that we do not judge credibility on appeal. (See *In re George T.* (2004) 33 Cal.4th 620, 634 (*George T.*) [reviewing court defers to the juvenile court's credibility determinations because the juvenile court, as the trier of fact, "is in a superior position to observe the demeanor of witnesses"]; *Nissan Motor Acceptance Corporation v. Superior Automotive Group, LLC* (2021) 63 Cal.App.5th 793, 817 (*Nissan*) ["When the exercise of the court's discretion depends on how it resolves questions of fact, we must defer to the court's

_____

[9]     In its letter brief, Agency claims that there appears to be "differing standards of review" under section 366.26(n), depending on whether a juvenile court decides to remove a child or maintain the child in a placement with a prospective adoptive parent. We disagree. Courts have consistently applied an abuse of discretion standard to the juvenile court's posttermination decision under section 366.26(n), and applied a substantial evidence standard of review to its findings in support of its exercise of that discretion, including based on the child's "best interest." (See e.g., *Amber G.*, *supra*, 86 Cal.App.5th at pp. 495–496 [" 'A juvenile court's decision to authorize a change in the minor's placement is reviewed for *abuse of discretion.* [Citation.] But we must also review the juvenile court's *finding* that the change is in the minor's best interests to determine whether there is *substantial evidence* in the record to support it.' (*In re M.M.* (2015) 235 Cal.App.4th 54, 64.)" (Italics added.)]; *In re L.M.* (2019) 39 Cal.App.5th 898, 915–916 (*L.M.*) ["[T]he juvenile court was in the best position to make the difficult decision of which placement, between two excellent options, was in [the child's] best interest. *Substantial evidence* supports the court's *finding* that removal here was in [the child's] best interest, and in so ruling the court did not *abuse its discretion.*" (Italics added.)].)

' "credibility determinations and findings on questions of . . . fact [if supported by substantial evidence]." ' ' "].)

2. Analysis

a. *Agency applied the incorrect statutory preference in recommending placement with Maternal Grandparents*

Preliminarily, we note that in recommending removal from the PAPs and placement with Maternal Grandparents after termination of parental rights, Agency incorrectly applied the relative placement preference (§ 361.3) instead of the applicable prospective adoptive parent preference (§ 366.26(n)). (See *Amber G.*, *supra*, 86 Cal.App.5th at p. 492 [section 361.3 does not apply after termination of parental rights]; *In re M.M.*, *supra*, 235 Cal.App.4th at p. 63 ["Once reunification efforts have failed, and the juvenile court has before it a proposed permanent plan of adoption, it is the caretaker who has preference."]; *Lauren R.*, *supra*, 148 Cal.App.4th at p. 855 [same].)

Agency's error is clear from the record in this case. Before MGM's ICPC was approved in August 2023, Agency stated it was in M.L.'s best interest to remain placed with the PAPs, noting the child had formed a "secure attachment" to them, and them to her, that they loved each other, and that the PAPs had completed all necessary steps for adoption. However, Agency did an about-face and changed its recommendation once MGM's ICPC was approved, relying on the relative placement preference for support. Agency's December 2023 removal notice explained it was recommending the change based on its "section 361.3 assessment" of Maternal Grandparents. Agency repeated this recommendation in its December 2023 status report, engaging in a section 361.3 analysis that favored relative placement.

If the issue before the juvenile court was M.L.'s *placement* with a relative prior to termination of parental rights, Agency would have satisfied its obligation by analyzing the factors in section 361.3 and submitting an

28

approved ICPC. But once parental rights were terminated, Agency "had a higher burden of proof . . . because its removal plan conflicted with the statutory preference of maintaining [M.L.'s] stability and permanency with [the PAPs]." (See *Amber G.*, *supra*, 86 Cal.App.5th at p. 498.) " '[W]e look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law.' [Citation.] The words 'removal' and 'placement' have different meanings and we presume the Legislature did not intend to use them interchangeably." (*T.W.*, *supra*, 203 Cal.App.4th at p. 45.)

Although the juvenile court considered certain factors in section 361.3 in determining the overarching question of whether a posttermination change was in M.L.'s "best interest," it correctly recognized that the prospective adoptive parent preference governed this case and that *Agency* had the burden to show by a preponderance of the evidence that removal of M.L. was in the child's "best interest." (See § 366.26(n)(3)(B); *L.M.*, *supra*, 39 Cal.App.5th at pp. 910–913 [noting the juvenile court may consider future placement of a child in deciding posttermination whether removal is in the child's best interest].) We turn next to that issue.

> b. *Substantial evidence supports the juvenile court's best interest finding*

>> (1) M.L.'s relationship with the PAPs and Maternal Relatives

The record shows the juvenile court considered M.L.'s current circumstances, including her relationship with the PAPs and maternal relatives, in finding removal from the PAPs was not in her best interest.

On the one hand, the juvenile court found that M.L. had been living with the PAPs for almost a year, or more than a third of her young life, was securely attached and bonded to them, and saw them as "parental figures" who were attuned to her needs and exhibited an "attachment-enhancing

29

parenting style" focused on her. It also found the PAPs had shown a "steady commitment to adopt" M.L. since placement.

On appeal, Petitioner has not challenged any of these findings. In any event, we conclude they are amply supported by the evidence summarized *ante*, including from Agency's own reports and Rettinghaus's trial testimony. (See *Mix*, *supra*, 14 Cal.3d at p. 614; *Amber G.*, *supra*, 86 Cal.App.5th at pp. 495–496; *Conbraco*, *supra*, 135 Cal.App.4th at p. 454.)

In addition, the juvenile court found that M.L. already had "experienced a lot" in her young life, having been exposed to a controlled substance in utero and spent her entire life in dependency; and that her removal could "result in significant psychological harm." In support of these findings, the juvenile court credited Dr. Volcani's testimony, in part because he had met and interacted with the PAPs and M.L. on a "handful of occasions," observing the child both with and without the PAPs.

Dr. Volcani opined that M.L. was at a "crucial stage," when a toddler was mostly a " 'we' " and just starting to become a " 'me' "; that M.L. had a "deep, primal, primary attachment" to the PAPs; that the "deficits" caused by the disruption of a secure attachment could have "profound" consequences on her brain structures and formation, as well as result in an "attachment disorder" caused by trauma; and that a child like M.L. between the age of two and three would be most likely to suffer trauma, leading to an "overwhelming sense of abandonment." From the foregoing, we conclude substantial evidence supports the court's finding that M.L. could suffer "significant psychological harm" if removed from the PAPs. (See *Mix*, *supra*, 14 Cal.3d at

p. 614; *Amber G.*, *supra*, 86 Cal.App.5th at pp. 495–496; *Conbraco*, *supra*, 135 Cal.App.4th at p. 454.)[10]

On the other hand, the juvenile court had concerns about the relationship, or lack thereof, between M.L. and her maternal relatives, particularly in regard to visits. The court found that before January 2024, MGM and Jada had only a "handful" of in-person visits with the child; that before February 2024, MGF had had no visits; and that while there had been some virtual visits during the course of the dependency, most often only MGM participated, with Jada "sometimes" joining in.

The record shows that throughout dependency until about mid-January 2024, when the maternal relatives came to San Diego for the start of the trial, they had very few in-person visits with M.L. Pilar, the child's first caregiver, reported that as of December 2022 when M.L. was about a year

---

10    Our conclusion that substantial evidence supports the juvenile court's finding that removing M.L. from the PAPs could cause her "significant psychological harm" also resolves Agency's contention that the court purportedly ignored "uncontroverted evidence" that M.L. would suffer little to no distress because she had made a smooth transition from Pilar to the PAPs. We note that this contention, like most (if not all) of Agency's arguments on appeal, focuses on the evidence and the juvenile court's weighing of such evidence in its role as trier of fact. By way of example only, Agency contends that, while there was "some evidence in the record supporting M.L.'s attachment to the [PAPs]; the evidence is not substantial when compared to the evidence supporting that M.L.'s long-term nurturing and growth and future physical, mental, and emotional needs would be served by placement with her maternal grandparents[,] where she can be connected to siblings and immersed in her culture." We note the record contains more than just "some" evidence supporting M.L.'s secure attachment to the PAPs. But the point is, to accept this argument (and most others of Agency) would require us to reweigh the evidence and make a new best-interest finding, despite the existence of substantial evidence supporting the juvenile court's determination that it was in M.L.'s best interest to remain in her current placement with the PAPs.

old, over the previous year MGM had had only one in-person visit and had called to inquire about M.L.'s well-being only three times. And Agency's May 2023 addendum report, issued in anticipation of the June 2023 hearing on termination of parental rights, expressed concern about placement of M.L. with MGM, in part due to the "inexistent" relationship between them.

In addition, in its December 2023 status review report prepared for the posttermination review hearing, Agency noted that after M.L. was placed in the home of the PAPs in April 2023, MGM had had only three virtual visits with the child, two of which were initiated by Erin. The one visit initiated by MGM took place only after the PAPs had sent MGM a picture of M.L.; and after Rettinghaus had stressed the importance of visiting, encouraging MGM to reach out to the PAPs.

As for Jada, who ostensibly would be M.L.'s primary caretaker for the next "three to five years" from "morning to night," the record shows she first visited in early January 2022, when M.L. was a newborn. However, Jada's next visit with M.L. was not until March 20, 2023, when Mother, during a supervised visit with M.L., called Jada. Although Jada had a few in-person visits with M.L. in late May 2023 while living with Mother in San Diego, which Agency described as distressing for M.L., it appears Jada's next in-person visit with her sister was not until January 2024. Prior to that, the record shows Jada only occasionally participated in video visits with M.L.

As for the remaining maternal relatives, the record shows MGF had no contact with M.L. until February 2024, after Rettinghaus admitted during her testimony that he had never visited the child. There is no record of M.L.'s older brother Ca.L. having any in-person visits with M.L., although he may have "popped in" and said "hello" once during a virtual visit. As for sister C.L., the record shows she had one in-person visit when M.L. was a

32

newborn, and it does not appear she had any virtual visits or other contact with M.L. throughout dependency.

From the foregoing, we thus conclude substantial evidence supports the juvenile court's concern about the lack of a relationship between M.L. and her maternal relatives throughout most of the dependency. (See *Mix*, *supra*, 14 Cal.3d at p. 614; *Amber G.*, *supra*, 86 Cal.App.5th at pp. 495–496; *Conbraco*, *supra*, 135 Cal.App.4th at p. 454.)

In addition, although Dr. Brodzinsky opined that research showed a child with M.L.'s qualities, including her resiliency, could successfully transition to a relative home, the juvenile court found this testimony of "limited utility" because he had never met or spoken with maternal relatives or M.L., and his opinions were "educative" and not "evaluative." As fact finder, the court was entitled to give this testimony the weight, if any, it deserved. (See *George T.*, *supra*, 33 Cal.4th at p. 634 [a reviewing court defers to the juvenile court's credibility determinations because it "is in a superior position to observe the demeanor of witnesses"]; *Nissan*, *supra*, 63 Cal.App.5th at p. 817 [same].)

(2) Stability and continuity of care

The juvenile court had no concerns about M.L.'s stability and continuity of care in the placement with PAPs. However, it had several concerns with the quality of care M.L. might receive if placed with Maternal Grandparents.

First, the juvenile court found MGM had been hesitant in accepting placement of M.L., instead suggesting various "options" short of placement and adoption. The court also noted that, although MGM had two adult children from a prior relationship, both had struggled under her care, and it was unclear whether MGM was now "better equipped" to address the trauma

33

M.L. likely would experience if removed from the PAPs. The court was also concerned by Agency's earlier reports, which portrayed MGM in an unfavorable light. It noted MGM denied making various statements attributed to her. As a result, the court found MGM's testimony "less than credible."

We conclude substantial evidence supports the juvenile court's findings that MGM had been hesitant in accepting placement of M.L., and that she had had her own "struggles" raising her children. (See *Mix, supra*, 14 Cal.3d at p. 614; *Amber G., supra*, 86 Cal.App.5th at pp. 495–496.)

Indeed, the record shows that in August 2022 Agency had asked MGM "multiple times" about placement and that she had always seemed "hesitant." Agency made similar observations in December 2022, when MGM inquired whether she and Pilar could "share custody" of M.L.; and when MGM informed Agency that MGF had been "surprised" and "shocked" about the potential placement of M.L. in their family home because of the child's age and because of his work schedule, leading Agency to withdraw the ICPC started for MGM.

Also in December 2022, MGM inquired whether the dependency could be delayed at least six months, until Jada turned 18 and became eligible to care for M.L. In April 2023, MGM informed Agency that Ca.L. and Jada wanted to "adopt" M.L. and that MGM would assist them "when they needed help." Also in April, MGM stated she wanted to be assessed for placement, telling Agency she could take care of the child "for a while" while waiting for Jada to turn 18, then they would care for her as a "team." As a result, in its May 2023 addendum, Agency expressed concerns about MGM's lack of commitment in taking placement of M.L. This evidence amply supports the

34

juvenile court's finding that MGM had been hesitant to take placement of M.L.

Moreover, the record substantiates that MGM had her own struggles in raising her two children, Adrian and Mother. Adrian was currently incarcerated in Arizona; MGM stated she would not allow any contact between him and M.L. if the child were in her care.

As for Mother, she ran away from home before her 18th birthday. As evidenced by this case, she used a controlled substance during pregnancy. When dependency first began, MGM told Agency that Mother was not a "user," but instead a "depressed mother who just lost her baby." MGM added that she had no concerns with Mother visiting M.L. while in Jada's care; and that as long as Mother was in a 12-step program and had a sponsor, she could visit M.L.

In addition, if placed with Maternal Grandparents, Jada and M.L. would be living in El Paso. It is reasonable to infer that Mother also would be visiting or even living there, inasmuch as MGM initially only wanted a guardianship because she did not want to terminate Mother's parental rights; and MGM had expressed concern about Mother's well-being as a result of her being alone and depressed while living in San Diego. This evidence, and the inferences to be drawn from it, further supports the juvenile court's concerns about placement of M.L. with Maternal Grandparents.

Second, the juvenile court was concerned about Jada's role as primary caretaker of M.L. The court noted that, although Jada appeared to have "good intentions," she had no children of her own, and it was "unclear if she has a plan or is equipped to handle any struggles [M.L] may have from the trauma that [M.L.] has experienced thus far," which the court found was likely given M.L.'s history. It also cited Agency's earlier reports of visits

35

between M.L. and Jada that did not "reflect a positive picture"; and that she had agreed to "change her life to help raise M.L." While finding that agreement "admirable to say the least," based on her "tone, demeanor, and answers on the stand," the court found Jada's testimony "less than credible," as it was not convinced she had a "realistic understanding of the task she has volunteered to undertake."

This concern is borne out by the record; Jada had just turned 18 years old, had no children of her own, and her only experience in "caring" for a child was when she was in *middle school* when she claimed to have taken care of a cousin (of some unknown age) "morning to night." And, in response to Rettinghaus's question whether she "truly" wanted to care for M.L. full time or had agreed to do so because "she thought she had to," Jada in December 2023 admitted "it's a mixture of both."

Third, the juvenile court was also concerned about changing placements because MGF first visited with M.L. in February 2024, during the trial, and earlier in the dependency he had expressed reluctance about placement, claiming the child was too young. In addition, given that MGF worked for 21 days at a time, the court was concerned M.L. would have little to no contact with him for long periods of time, and there was a dearth of information about MGF's ability to parent and handle what the court found were M.L.'s "special needs."

This evidence, which we conclude is substantial, supports the juvenile court's finding of "concerns" about the quality of care that M.L. might receive if placed with Maternal Grandparents, concerns that did not exist in her placement with PAPs, as Agency also noted (see *Mix*, *supra*, 14 Cal.3d at p. 614; *Amber G., supra*, 86 Cal.App.5th at pp. 495–496; *Conbraco, supra*,

36

135 Cal.App.4th at p. 454); and further supports the court's finding that a change in placement was not in M.L.'s best interest (§ 366.26(n)(3)(B)).

(3) Other factors

The juvenile court credited Erin's testimony and found the PAPs were committed to facilitating a relationship between M.L. and her biological family; that the PAPs' conduct to date supported that expression of commitment, as Erin had promptly reached out to MGM shortly after learning that MGM wanted to visit with the child; and that the PAPs already had made efforts to ensure that M.L. had "exposure to her culture," including enrolling her in a bilingual school when of school age. The court recognized that, while attending a bilingual school may not be the "same" as living with a Spanish-speaking family, it had considered this factor and given it the "appropriate weight."

The juvenile court also found that further delaying permanency in a stable home was "not in [M.L.'s] best interest," as the PAPs were "ready to adopt" M.L. and would have finalized the adoption had it not been delayed by Agency.

The juvenile court considered sibling relationships in deciding the best interest of M.L. It found her siblings were "all in different stages of their li[ves] than [M.L.]" Although Dr. Brodzinsky testified that placement of a child with relatives, including siblings, can mitigate the disruption of moving a child and have positive impacts, the court found that Jada and M.L. had a "limited relationship based on their limited contact to date"; that Jada was "significantly older than [M.L.]," which age difference would "likely create limits on the extent of their relationship"; and that the benefits of M.L. being placed with siblings were therefore limited in this case.

37

In sum, the juvenile court was presented with an important and difficult posttermination placement decision. It was up to the court to evaluate which placement maximized M.L.'s opportunity to develop into a healthy, well-adjusted adult. The court applied the correct legal standard, properly exercised its broad discretion, and found under section 366.26(n) that it was in M.L.'s best interest to remain with PAPs, a finding we conclude is supported by substantial evidence. (See *Nissan, supra,* 63 Cal.App.5th at p. 817; *Casey D., supra,* 70 Cal.App.4th at pp. 52–53.)[11]

C. *Due Process*

Pivoting, Petitioner contends that Agency deprived her of due process by its purported inadequate preparation of its section 366.26 report, based on its failure to provide a preliminary assessment of MGM in violation of

[11] In light of our conclusion, we reject Petitioner's contention that the juvenile court erred when it purportedly failed to consider her "substantial contacts" with the maternal relatives; deprived her of a "[n]ormal, familial relationship with her siblings"; placed undue emphasis on the amount of time she had spent in the care of the PAPs; and ignored the importance of her culture, in violation of her "bill of rights" as a foster child. (See § 16001.9, subd. (a)(3) [right to "receive adequate and healthy food, adequate clothing, grooming and hygiene products," with "[c]lothing and grooming and hygiene products" "respect[ing] the child's culture, ethnicity, and gender identity and expression"]; *id.,* subd. (a)(16) [right to "participate in extracurricular, cultural, racial, ethnic, personal enrichment, and social activities, including, but not limited to, access to computer technology and the internet, consistent with the child's age, maturity, developmental level, sexual orientation, and gender identity and expression"].)

section 16001.9, subdivision (a)(5).[12]  The record shows Agency filed its January 24, 2023 report on December 30, 2022; and prepared addenda on January 24, 2023; April 17 and 24; May 22; and June 20 and June 22; all of which Petitioner received through her *current* guardian ad litem.  Despite receiving the section 366.26 report and addenda, at no point did Petitioner object to the purported inadequacy of the information in the reports, or to the termination of parental rights.  (See *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 [concluding the parents forfeited any claim of deficiency or lack of thoroughness in the SSA's section 366.26 report based on their failure "to assert it in the juvenile court"].)

Nor was any appeal filed to the June 21, 2023 order terminating parental rights, as we have noted.  (See rule 8.406(a); *Daniel D., supra*, 24 Cal.App.4th at p. 1832, fn. 8 [" 'An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing an appeal has passed.' "].)  We thus conclude any purported deficiency in the reports has been forfeited.

Reaching the merits despite forfeiture, due process requirements in the context of child dependency litigation primarily focus on the right to a hearing and the right to notice.  (*In re B.G.* (1974) 11 Cal.3d 679, 689; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412–413 (*Crystal J.*).)  "A meaningful hearing requires an opportunity to examine evidence and cross-examine

---

[12]  Subdivision (a)(5) of section 16001.9, which is part of a foster child's "bill of rights," provides that a child has the right to "be placed with a relative or nonrelative extended family member if an appropriate and willing individual is available."  (§ 16001.9, subd. (a)(5).)  We note that Petitioner cites no authority to support her contention that subdivision (a)(5) of section 16001.9 overrides section 366.26(n), nor in our independent research have we found any such authority.

witnesses, and hence a failure to provide parents with a copy of the social worker's report, upon which the court will rely in coming to a decision, is a denial of due process. [Citation.] Where an investigative report is required prior to the making of a dependency decision, and it is *completely* omitted, due process may be implicated because a cornerstone of the evidentiary structure upon which both the court and parents are entitled to rely has been omitted." (*Crystal J.*, at p. 413.)

"Where, however, the assessment report *is* prepared, *is* available to the parties in advance of the noticed hearing, and *does* address the principal questions at issue in the particular proceeding, errors or omissions in the report cannot be characterized in terms of denial of due process. (See *In re Heidi T.* (1978) 87 Cal.App.3d 864, 875 [possible deficiencies in assessment report harmless error in light of other evidence]; *In re Robert J.* (1982) 129 Cal.App.3d 894, 901–902 [irrelevant material in a report deemed not prejudicial because of independent evidence supporting the trial court's ruling].) Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights. Such deficiencies, however, will ordinarily *not* amount to a deprivation of procedural due process." (*Crystal J.*, *supra*, 12 Cal.App.4th at p. 413, italics added.)

Here, when it terminated parental rights in June 2023, the juvenile court found M.L. was likely to be adopted if parental rights were terminated and that no exceptions to termination of such rights existed. M.L. at the time was already placed with the PAPs, who were and remain committed to adopt her. Also at this time, Maternal Grandparents did not have an approved ICPC for their home. In light of these facts and the record as a whole, we conclude any purported omission of an assessment of MGM as a possible

40

relative placement in the section 366.26 report was insignificant. (See *Crystal J.*, *supra*, 12 Cal.App.4th at p. 413.)

Moreover, we find inapposite the case on which Petitioner mainly relies, *In re B.D.* (2019) 35 Cal.App.5th 803 (*B.D.*). There, unlike here, the parents appealed from the termination of their parental rights, which was joined by minor. In what the Court of Appeal noted was a " 'rare and compelling case' " (*id.* at p. 809), it found that about a year before parental rights had been terminated and minor was placed with foster parents in anticipation of adoption, the SSA had investigated whether minor had been sexually abused in the foster parents' home; that SSA did not disclose that investigation in its section 366.26 report, or the fact that one of the foster parents had spent seven years in state prison for a home invasion robbery; that this same parent had three adult sons who, as juveniles, had been sexually abused, but who were also alleged to have committed sexual offenses against other juveniles; that all his three sons had been declared wards and placed in a group home for rehabilitation; that at least one of the sons was living with the foster parents *while* minor was in their care; that while the foster parent was incarcerated, his parental rights to all three sons were terminated; that *while* in the foster parents' home, minor was sharing the same room as an adult nephew of one of the foster parents who also had been sexually abused as a child; and that SSA knew all this information well before it conducted the sexual abuse investigation, but saw no need to mention it because the foster parents were licensed. (*B.D.*, at p. 811.) In addition, this information all came out after SSA investigated the foster parents for physical abuse and neglect, about a month after parental rights had been terminated. (*Id.* at p. 810.)

Petitioner's claim of the purported inadequacy of Agency's section 366.26 report is nothing like the situation in *B.D.* There is no allegation that Agency failed to disclose any information that even remotely rises to the level of the facts in *B.D.*, jeopardizing the safety and well-being of M.L.

In addition, the contention that Agency allegedly failed to assess MGM in its section 366.26 report and addenda was not a disclosure issue as was the case in *B.D.*, as the record is replete with evidence that Agency and MGM were having ongoing discussions about whether Maternal Grandparents wanted to be assessed for placement of M.L., including well before termination of parental rights in June 2023. Furthermore, at about the same time Agency was preparing its section 366.26 report, MGM informed it that MGF was "surprised" and "shocked" about M.L.'s possible placement in their home, and MGM did not want to go forward with the ICPC as a result.

Thus, on the merits we reject Petitioner's contention she was deprived of procedural due process as a result of the purported deficiency in Agency's section 366.26 report, and that her rights were somehow violated under subdivision (a)(5) of section 16001.9.

Finally, we also reject Petitioner's claim she was deprived of due process when the juvenile court continued the section 366.26(n) hearing. Although subdivision (n)(3)(B) of section 366.26 provides a hearing shall be held "as soon as possible and not later than five court days after the petition is filed," it also provides that a juvenile court may grant a continuance "for good cause" and "set the matter for hearing as soon as possible." (§ 366.26(n)(3)(B).)

Here, as Petitioner acknowledges, the record shows the juvenile court made a good cause finding, after it was asked to set a hearing on Agency's

request to remove M.L. from the PAPs and the PAPs objected to such removal. At the December 18, 2023 hearing,[13] the juvenile court noted that the PAPs had made a request for documents, including what it found were a "number" of Agency reports. The court noted it would need to review this discovery and make any redactions, and the parties would have to sign a protective order. Agency noted the parties estimated the trial would last about four days and that it needed additional time to respond to briefing submitted by the PAPs.

Petitioner, through her guardian ad litem, questioned whether the juvenile court could start trial within five days if the court had to review the discovery and make redactions. Petitioner also argued that only reports regarding placement should be given to the PAPs, and suggested giving the PAPs unredacted documents to save time.

Noting they were entitled to a hearing, the PAPs argued that without the discovery they were unable to evaluate what the witnesses would be testifying to in this case, as Agency intended to call several including an expert. The PAPs stated they could be ready for trial about two weeks after receiving the discovery, and indicated they also intended to call their own witnesses, including an expert.

After making a finding of good cause, the juvenile court ordered the parties—including Petitioner—to meet and confer over the discovery by January 3, 2024, at the latest, in order to keep the case moving forward, and to provide the court with the results as well. It set a special hearing for January 8, should there be any disputes between the parties over the discovery.

---

13     Petitioner incorrectly identifies the date of this hearing as December 12, 2023.

The juvenile court also ordered the parties to submit by January 12—in advance of the pretrial status conference set for January 16—a joint list containing the following information: "trial issues, offers of proof as to each witness, all evidence by way of documents, the purpose of those respective items and the relevance as to each for trial, the topics of any pretrial motions," any briefs with the applicable law, and expert information, including names, areas of expertise, a statement of qualifications, and the substance of proposed testimony. The court set January 23 as the date to start trial and set the postpermanency planning hearing for June 18, 2024.

At the January 8 special set hearing, the parties discussed their meet and confer efforts and the discovery. At no time during that hearing did Petitioner object on due process grounds to the timing of the trial. As of that date, the PAPs still had not been given the discovery, despite the fact the juvenile court had ordered the parties to submit a joint list with various items by January 12. The PAPs were also concerned because Agency had filed what Agency noted was a "very dense report" that the PAPs had not yet received. In response, the court moved the deadline for the joint list to January 16, giving the parties and the court "a little more time."

The record thus shows the juvenile court and the parties worked with diligence to get this case ready for trial; that the delay in the trial was necessary given the discovery issues, the number of witnesses, and the court's busy calendar; and that M.L. got the process she was due, as evidenced by the voluminous record in this case. (See *In re Cole C.* (2009) 174 Cal.App.4th 900, 913 ["[I]n the context of dependency law, '[d]ue process . . . tends to focus on the right to a hearing, the right to notice and an opportunity to present objections. [Citations.] The parent in a dependency proceeding has a due process right to confront and cross-examine witnesses.' "].) We therefore

44

conclude under the facts of this case that the juvenile court did not err in exercising its discretion and continuing the trial, and that its finding of good cause is supported by substantial evidence.  We thus reject Petitioner's due process challenge.

## DISPOSITION

The juvenile court's March 4 Order is affirmed.  We invite the parties to stipulate to an immediate remittitur to expedite M.L.'s adoption proceedings with the PAPs.  (Rule 8.272(c)(1).)

IRION, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

45